# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01375-COA

**MICHAEL DEVON JONES A/K/A MIKE JONES A/K/A MICHAEL JONES**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/09/2021 |
| TRIAL JUDGE: | HON. GEORGE M. MITCHELL JR. |
| COURT FROM WHICH APPEALED: | WINSTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/08/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND SMITH, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Michael Jones was convicted of second-degree murder following a jury trial in the Winston County Circuit Court.  On appeal, Jones argues that he is entitled to a new trial because the jury's verdict is contrary to the overwhelming weight of the evidence and because the trial judge erred by refusing a jury instruction on the excuse of accident.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On the evening of April 10, 2020, Jones joined a game of craps at the Ivy Apartments in Louisville.  After Jones won a roll, Malik Hudson told him he owed "the house" $5 from

the pot. Jones refused to pay the house because the house was not providing marijuana or beer. Jones and Hudson argued, and the game broke up soon after. Jones left the apartment. As he left, he threatened to break Hudson's jaw and rob him and threatened to kill the other players if they restarted the game without him. Jones's brother Tyrone tried to calm him down, but Jones retrieved a gun and returned to the apartment looking for Hudson. Jones did not find Hudson, so he drove to Hudson's mother's house and offered Hudson's pregnant wife money in exchange for sex. Hudson's mother and wife told Jones to leave.[1] Jones then returned to the Ivy Apartments. Hudson later walked downstairs to his car. According to multiple witnesses, as Hudson drove out of the parking lot, Jones walked up to Hudson's car and shot Hudson in the head. Hudson was pronounced dead at the hospital later that night. Jones was arrested the next day and gave a written statement to police. A grand jury indicted Jones for first-degree murder.

¶3.     At trial, Roderick Steele, Kaleb Mosley, and Jeremy Shell all testified that they saw Jones walk up to Hudson's car and shoot Hudson as he was driving out of the parking lot. Brittney Coleman testified that she saw Hudson get into his car and then heard gunshots moments later as she walked back into the apartment. Steele, Mosley, Shell, and Coleman all testified that they never saw Hudson holding a gun at any point that night.[2]

---

[1] At trial, Jones denied that he retrieved a gun or propositioned Hudson's wife.

[2] At trial, Shell contradicted himself regarding whether he actually saw the shooting. At one point, he testified that he saw Jones shoot Hudson. At other points, he stated that it was dark and that he only heard the gunshots. In any event, Shell testified that he walked Hudson to his car, was with Hudson only moments before the shooting, and never saw him display or possess a gun.

¶4.    Jones's signed statement was admitted into evidence at trial. Jones told police that he left the apartment after he and Hudson argued over his refusal to pay "the house." Jones said he saw Hudson later in the parking lot standing next to his car with the car door open and a gun "in his hand." Jones stated that he "walked on by" and did not engage Hudson. Jones stated that Hudson got in his car and started to drive away when suddenly "[s]hots fired off," and people yelled that Hudson was dead. Jones denied that he shot Hudson, claiming that he "was too drunk to shoot a pistol" at the time. Jones also stated, "After the shots were fired me and Dreka were standing and fighting over a gun, it was a revolver, and I let the gun go before I ended up getting shot. I don't know where Dreka went." At trial, Jones testified that "Dreka" was his nephew Lester Johnson. As noted below, Jones's nephew William Johnson testified at trial. It is not clear whether Lester and William are the same person.

¶5.    A Louisville police officer testified that no gun was recovered from Hudson's person or car. Hudson's hands and clothing were tested for gunshot residue, and all tests were negative. The medical examiner testified that Hudson was killed by a single gunshot wound to his left forehead from a distance of no more than a few feet. The shooter was standing to Hudson's left, firing into the open driver's side window of Hudson's car.

¶6.    Jones's nephew William Johnson and Jones's brothers Lonzell Jones and Tyrone Jones testified for the defense. Johnson testified that Hudson had threatened Jones with a gun earlier that night. Johnson stated that he did not witness the shooting but heard the gunshots. Lonzell was not present when the shooting occurred but stated that Hudson "bought [a gun] that morning." Tyrone stated that he witnessed Hudson buy a gun "in the

3

evening"; however, Tyrone could not recall who sold Hudson the gun, where he bought it, or who else was present.

¶7.    Jones testified in his own defense at trial. Jones testified that prior to joining the craps game, he made clear that he was not going to pay "the house" because the house was not providing marijuana or beer. Jones admitted that he "got kind of violent" when Hudson later tried to make him pay. Jones testified that he left the apartment briefly to talk to Tyrone, and when he returned, Hudson threatened him with a gun. Jones stated that he then left the apartment again and walked to his sister's house across the street. Jones testified that later, while he was outside his sister's house drinking beer, he saw Hudson get into his car and start to drive away. According to Jones, "that's when the fire shot off," Hudson was shot, and Hudson's car slowly rolled to a stop against a utility pole.

¶8.    On direct examination, Jones's attorney asked him if he shot Hudson. Jones answered,

> I says several shots were fired. One of mine probably hit [Hudson]. Because at the end, me and Lester Johnson, we were fighting over a gun. And I let the gun go because I didn't want it to go off. I -- now prior to my shooting, it was another shot fired. . . . So I guess you could . . . say I shot him, or you could say someone else shot him. I can't just . . . say yes, I was the one that shot him. I can't say that.

Jones claimed that as Hudson was pulling out of the parking lot, Hudson pointed something that "had to be a gun" in Jones's direction.

¶9.    On cross-examination, Jones stated that he "did shoot two shots" at Hudson "because [his] life was in danger." But he claimed that Hudson "point[ed] something" at him first, and "a shot rang out" before he (Jones) fired his gun. Jones claimed that he was not carrying a

4

gun of his own but "just snatched the pistol from one of them little guys right there beside [him]." Jones said that these "little guys" all carried "pistols on their hip," and he "just reached over and grabbed [a gun] off [one little guy's] hip." Jones did not know any of the little guys' names. Jones testified that *after* the shooting stopped, he and Johnson "tussl[ed] over the pistol," and he "just let the pistol go, because [he did not] want to get shot."

¶10. The court instructed the jury on first-degree murder, second-degree murder, heat-of-passion manslaughter, culpable-negligence manslaughter, imperfect self-defense, and self-defense. The jury found Jones guilty of second-degree murder, and the court sentenced him to serve thirty years in the custody of the Department of Corrections. Jones filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and appealed.

**ANALYSIS**

¶11. On appeal, Jones argues that he is entitled to a new trial because the jury's verdict is against the overwhelming weight of the evidence and because the trial judge refused his proposed instruction on the excuse of accident.

### I. Weight of the Evidence

¶12. The trial judge "may grant a new trial . . . if the verdict is contrary to the law or the weight of the evidence." MRCrP 25(b)(2). We review a trial judge's denial of a motion for a new trial only for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). Moreover, when we review the denial of a motion for a new trial, we afford great deference to the jury's verdict. *Id.* at 289 (¶1). The jury is the fact-finder, and this Court will not "assume[] the role of juror on appeal." *Id.* As the Supreme Court made clear in *Little*,

5

[w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

*Id.*

¶13.    Here, Jones argues that his second-degree murder conviction is not supported by the weight of the evidence. He asserts that the evidence, at most, supports a conviction for heat-of-passion manslaughter or culpable negligence manslaughter.

¶14.    Second-degree murder is "[t]he killing of a human being without the authority of law" by "an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020). "Depraved-heart murder and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness from which malice may be implied." *Hawkins v. State*, 101 So. 3d 638, 643 (¶17) (Miss. 2012). Depraved-heart murder involves "grave recklessness manifesting utter disregard or indifference to the resultant creation of eminent danger to [human] life." *Windham v. State*, 602 So. 2d 798, 802 (Miss. 1992). "Depraved-heart murder encompasses a reckless and eminently dangerous act directed toward a single individual, from which malice is implied." *Holliman v. State*, 178 So. 3d 689, 698-99 (¶20) (Miss. 2015) (quotation marks omitted).

¶15.    Heat-of-passion manslaughter is a "killing . . . without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of

6

law, and not in necessary self-defense." Miss. Code Ann. § 97-3-35 (Rev. 2020). "Heat of passion" is defined as a "state of violent and uncontrollable rage engendered by a blow or certain other provocation given[.]" *Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). This passion or anger must be "suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time." *Id.*

¶16. Here, the jury's verdict finding Jones guilty of second-degree murder is not contrary to the overwhelming weight of the evidence. Three eyewitnesses testified that Jones walked up to Hudson's car as Hudson was driving away and shot Hudson in the head. Those same witnesses and another witness all testified that Hudson did not have a gun at any point during the night. Whether those witnesses were credible was a matter for the jury to determine. *Little*, 233 So. 3d at 289 (¶1). Likewise, it was the jury's role to resolve the conflicts in the evidence. *Id.* "[V]iew[ing] the evidence in the light most favorable to the verdict," we certainly cannot say that the jury's "verdict . . . is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* Therefore, it follows that the trial judge did not abuse his discretion by denying Jones's motion for a new trial.

## II.    Accident Instruction

¶17. We review the refusal of a jury instruction for an abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). "[T]he instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no

injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law." *Id.* at 73-74 (¶20) (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)). "In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Evans v. State*, 797 So. 2d 811, 815 (¶11) (Miss. 2000) (quoting *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995)). Nonetheless, a defendant must "offer *some* evidence to support his . . . theory before the trial court [is] obligated to instruct the jury on it." *Nelson v. State*, 284 So. 3d 711, 718 (¶26) (Miss. 2019) (emphasis added) (affirming the refusal of an instruction on imperfect self-defense). A trial judge properly refuses a requested instruction that is not supported by the evidence. *Id.*

¶18. Jones argues that the trial judge erred by refusing his proposed instruction on the excuse of accident. The instruction, based on Mississippi Code Annotated section 97-3-17(b) (Rev. 2020), stated as follows:

> The Court instructs the jury that the killing of any human being by the act, procurement, or omission of another shall be excusable when committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, and if you find that Michael Jones killed Malik Hudson under these circumstances then you shall acquit Michael Jones and find him not guilty.

Jones claims that his testimony about "tussling" with his nephew over a gun supported an accident instruction.

¶19. We disagree. Jones never stated that he accidentally fired a gun. More specifically, Jones never stated that the gun went off while he and his nephew were "tussling" over it.

8

Moreover, Jones himself made clear in his testimony at trial that this "tussling" incident occurred "[*a*]*fter* the shots and all that were rang out." (Emphasis added). Likewise, Jones's statement to police made clear that the incident occurred "[*a*]*fter* the shots were fired" and *after* others had already begun "hollering" that Hudson was "dead." (Emphasis added). In short, there was no evidence that Jones ever fired a gun by accident. Rather, Jones claimed at trial that he "did shoot two shots" at Hudson "[*b*]*ecause* [*his*] *life was in danger*." (Emphasis added).[3] Because Jones presented no evidence that he accidentally fired a gun at Hudson, the trial judge did not err by refusing the proposed instruction. *Montana v. State*, 822 So. 2d 954, 962 (¶33) (Miss. 2002) (affirming the refusal of an accident instruction because "all evidence demonstrated that each shot fired by [the defendant] was intentionally fired," and "[a]n intentional act cannot fit the doctrine of accident or misfortune").

## CONCLUSION

¶20.    The trial judge did not abuse his discretion by denying Jones's motion for a new trial and did not err by refusing Jones's proposed accident instruction.

¶21.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

---

[3] As discussed above, other witnesses to the shooting also testified that Jones deliberately fired into the open driver's side window of Hudson's car.

9